UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**MATTHEW F. FICARRA,**

               **Plaintiff,**

- v -                                                               5:14-CV-00869
                                                                           (BSK/ATB)

**BRUCE K. GERMAIN,**

               **Defendant.**

_____

**IN THE MATTER OF THE COMPLAINT,**

- of -                                                             5:14-CV-01013
                                                                         (BSK/ATB)

**BRUCE GERMAIN, as owner of the motor vessel
GAME DAY, a 1990, 38 foot recreational vessel, for
Exoneration from or Limitation of Liability,**

                            **Petitioner.**

_____

**Appearances:**

For Plaintiff Matthew F. Ficarra:
**Anthony R. Martoccia**
McMahon, Kublick Law Firm
500 South Salina Street, Suite 816
Syracuse, NY 13202

For Defendant/Petitioner Bruce K. Germain:
**James E. Mercante**
**Richard Gonzalez**
Rubin, Fiorella Law Firm
630 Third Avenue
New York, NY 10017

**Hon. Brenda K. Sannes, United States District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Matthew F. Ficarra ("Ficarra") commenced an action on June 16, 2014 in New York State Supreme Court, Onondaga County, against Bruce K. Germain ("Germain") for negligence under New York state common law in connection with an accident on Oneida Lake. (Ficarra v. Germain, No. 5:14-cv-00869 ("Ficarra"), Dkt. No. 1, Exh. A, pp. 5-9). On July 17, 2014, Germain filed a Notice of Removal, arguing that the case falls under admiralty jurisdiction, over which federal courts have original, exclusive jurisdiction pursuant to 28 U.S.C. § 1333(1). (Ficarra Dkt. No. 1).

On August 14, 2014, Germain filed a complaint (the "petition") in the Northern District of New York for exoneration or limitation of liability pursuant to 46 U.S.C. §§ 30501-30511, seeking to limit his losses for the accident to the value of the vessel involved. (In the Matter of the Complaint of Germain, No. 5:14-cv-1013 ("Germain") Dkt. No. 1). Germain's petition was assigned to Senior District Court Judge Lawrence E. Kahn as a related case to Ficarra's case. (Germain Dkt. No. 6).

On August 18, 2014, Ficarra moved to remand his case back to state court, arguing that the accident which gave rise to his lawsuit does not fall within admiralty jurisdiction. *See* Memorandum of Law In Support of Motion Seeking Remand Back To State Court, Ficarra Dkt. No. 7-2 ("Ficarra Br."). On August 20, 2014, Judge Kahn issued an order in Germain's case directing Germain to file a memorandum explaining why his petition should not be dismissed for lack of subject matter jurisdiction. (Germain Dkt. No. 7). Germain has filed a memorandum in both actions, opposing remand, and now arguing that diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1), in addition to admiralty jurisdiction. *See* Memorandum of Law In

1

Opposition to Plaintiff's Motion Seeking to Remand Back to State Court, Ficarra Dkt. No. 11, Germain Dkt. No. 10 ("Germain Br."). For the reasons below, the Court does not have subject matter jurisdiction over Ficarra's case or the related petition by Germain.[1]

## II.  FACTS[2]

On July 30, 2011, Germain took Ficarra and three other guests on Germain's 38-foot motor boat to Three Mile Bay on Oneida Lake. (Ficarra Dkt. No. 1, Exh. A, ¶ 4; Germain Aff., ¶¶ 1-2.) Oneida Lake is connected to the New York State Erie Canal System. (Germain Br., Exh. D, Ficarra Dkt. No. 11-4). Germain and his guests left from Brewerton, New York and drove through a federal ship channel to Three Mile Bay. (Germain Aff., ¶¶ 2, 5).

According to Germain, Three Mile Bay is a "popular anchoring spot for vessels," which is "heavily patrolled by marine police vessels" and is located "less than a nautical mile from the charted federal ship channel." (Germain Aff., ¶¶ 2, 4). According to Ficarra, Three Mile Bay is "used primarily for recreational swimming." (Ficarra Aff., ¶ 4).[3] A Nautical Chart of Oneida Lake shows the waters of Three Mile Bay have a depth ranging from three to seven feet. (Germain Br., Exh. D, Ficarra Dkt. No. 11-4).

---

[1] This matter was reassigned to the undersigned by Order of Chief Judge Gary L. Sharpe on December 29, 2014.

[2] The uncontroverted facts in the complaints in each case are assumed to be true for the purposes of this decision, and all reasonable inferences are drawn in favor of Germain as the party seeking jurisdiction. *See Tandon v. Captain's Cove Marina of Bridgeport*, 752 F.3d 239, 243 (2d Cir. 2014). In addition, the Court has considered the facts presented in the Affidavit of Matthew F. Ficarra In Support of the Motion to Remand ("Ficarra Aff."), Ficarra Dkt. No. 7-1; the Affidavit of Bruce K. Germain in Support of Removal ("Germain Aff."), Ficarra Dkt. No. 11-3; and the documents attached to Germain's brief, Ficarra Dkt. Nos. 11-4, 11-5. *See Tandon*, 752 F.3d at 243 ("Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of act by reference to evidence outside the pleadings, such as affidavits.") (bracket and citation omitted). All citations to the parties' submissions reference the page numbers generated and marked by the ECF system.

[3] The exhibits submitted by Germain indicate that Three Mile Bay is a popular summer destination for pleasure boaters and people using the beach. (Germain Br., Exh. E, Ficarra Dkt. No. 11-5, p. 2). The beach is accessible by service road and has a boat launch ramp and parking for "20 cars and trailers." (*Id.*). In 2009, the New York State Department of Environmental Conservation, which maintains the area, closed beach access for vehicles during the summer months after incidents involving parties onshore and on boats in the bay, but people are still permitted to use the beach. (*Id.*, pp. 5-7).

Germain has provided the following account of the incident. Germain and his guests arrived at Three Mile Bay at approximately 12:30 p.m., and Germain anchored the vessel in three to six feet of water. (Germain Aff., ¶ 6). The bay was crowded with other boats. (*Id.*). At approximately 6:00 p.m., they began to prepare to get the vessel underway for the return trip to Brewerton, and passengers started to return to the vessel. (*Id.*, ¶ 7). Ficarra returned to the vessel and, after first diving off of the port side into the water, he went to the rear boarding platform, and then he suddenly did a "back flip" into the water. (*Id.*, ¶ 9). Germain went into the water with others to help Ficarra until local marine rescue and police boats arrived. (*Id.*, ¶¶ 10-11). A rescue boat took Ficarra back to Brewerton, via the same federal ship channel used by Germain on the way to Three Mile Bay. (*Id.*, ¶¶ 2, 11).

Ficarra has provided a consistent account of the accident. Ficarra states that while the boat was anchored in shallow water, approximately 50-75 yards from the shoreline, he dove off Germain's boat, struck his head on the lake bottom, and was severely injured. (Ficarra Aff., ¶¶ 2, 3). Ficarra suffered "serious spinal cord injury," with "paralysis and quadraplegia from the nipple level downward." (Ficarra Dkt. No. 1, Exh. A, ¶ 7). The complaint alleges, *inter alia*, that Germain was negligent in failing to adequately warn Ficarra that the shallow water where Germain had anchored his boat was unsafe for diving. (*Id.*, ¶ 9).

### III. DISCUSSION

#### A. Legal Standard

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). After a case is removed to district court, "[if] at any

time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). When a plaintiff files a motion to remand challenging the removal of an action from state court, "the defendant bears the burden of demonstrating the propriety of removal." *Cal. Pub. Emples. Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004) (citing *Grimo v. Blue Cross/Blue Shield of Vermont*, 34 F.3d 148, 151 (2d Cir. 1994)). "The party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted).

B.  **Removal Based On Admiralty Jurisdiction**

The federal judicial power extends "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl.1; *see* 28 U.S.C. § 1333(1) (giving federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction").

In order to invoke admiralty jurisdiction over plaintiff Ficarra's tort claim, defendant Germain bears the burden of satisfying both the (1) "location" test; and (2) "connection" test. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *Tandon*, 752 F.3d 239, 247; *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999). Here, the parties agree the location test has been met since the alleged tort occurred on a navigable body of water, Oneida Lake. (Ficarra Br., p. 6; Germain Br., p. 8). The question before the Court is whether the connection test has been satisfied. This connection test consists of two parts:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Grubart*, 513 U.S. at 534 (internal citations and quotations omitted); *Tandon*, 752 F.3d at 248.

For the first part of the test, the Court must describe the "general features" of the incident to assess whether this type of incident has the potential to disrupt maritime commerce. This description should be "general enough to capture the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases." *Tandon*, 752 F.3d at 249. The description should focus on "the direct and immediate cause of the injuries suffered, rather than the alleged negligence underlying the suit." *Id*. (describing incident as "physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water"); *see also Grubart*, 513 U.S. at 538-39 ("damage by a vessel in navigable water to an underwater structure"); *Sisson v. Ruby*, 497 U.S. 358, 362-363 (1990) ("fire on a vessel docked at a marina on navigable waters"). In describing the incident, both "the general location of the incident and the roles of the persons involved…can be relevant to the potential effect on maritime commerce." *Tandon*, 752 F.3d at 249.

Ficarra proposes the following general description of the incident: "an injury to person as a result of recreational swimming and diving in shallow water of a bay of a lake used primarily for recreational swimming" (Ficarra Br., p. 7); whereas Germain suggests: "a passenger aboard a vessel who enters navigable waters to assist the vessel in preparing to get underway and is thereby injured." (Germain Br., p. 10). The Court finds that the incident is best described as an injury to a recreational passenger who jumped from a recreational vessel in a shallow recreational bay of navigable waters. This description focuses on the "direct and immediate cause of the injuries" suffered by Ficarra and takes into account the general location of the incident and the roles of the persons involved.

The Court must then determine whether this type of incident is "likely to disrupt" maritime commerce, regardless of whether the case under consideration had any such effect.

*Grubart*, 513 U.S. at 538. In other words, the question is "whether the incident could be seen within a class of incidents that posed more than fanciful risk to commercial shipping." *Id*. at 539. In making this determination, the Court must be mindful that "[n]ot all torts that happen on or over navigable water have the potential to disrupt commercial shipping. Otherwise, there would be no need for the potential effect test at all." *Tandon*, 752 F.3d at 251.

The type of incident here does not realistically pose a threat to maritime commerce. First, this type of incident cannot itself "create any obstruction to the free passage of commercial ships along navigable waterways." *Tandon*, 752 F.3d at 249 (contrasting with collision between vessels in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982) and collision between vessel and underwater structure in *Grubart*). This class of incidents is limited to those in shallow, recreational bays—waters unsuitable for commercial shipping. Therefore, even if the crew of the vessel was distracted by the passenger jumping overboard, there would be no risk of collision with commercial vessels. Nor can this type of incident "immediately damage nearby commercial vessels." *Tandon*, 752 F.3d at 249 (contrasting with marina fire in *Sisson*). Moreover, this type of incident involves only recreational visitors, and not persons engaged in maritime employment who may have a potential effect on maritime commerce if injured. *Id*.

Germain asserts that this type of incident may still potentially disrupt maritime commerce because an injured passenger in navigable waters "invites rescue," which itself "may present a risk to maritime commerce because the waters were traversed and occupied by vessels of various sizes, and the rescuers could have been distracted from hazards posed by other approaching boats." (Germain Br., p. 10). This "potential rescue" effect has in some cases supported a finding of admiralty jurisdiction. *See, e.g.*, *Roane v. Greenwich Swim Comm.*, 330 F. Supp. 2d 306, 314 (S.D.N.Y. 2004); *Sollosy v. Hyatt Corp.*, 208 F. Supp. 2d 205, 212 (D. Conn. 2002).

However, those cases typically involve rescue at sea or far from shore where the potential risk of an emergency response to snarl commercial shipping traffic is more realistic. *Roane*, 330 F. Supp. 2d at 314 (alleged negligent life salvage of swimmer in distress on Long Island sound); *Sollosy*, 208 F. Supp. 2d at 212 (jet ski accident in Cayman Islands waters). The type of incident in this case is limited to shallow, recreational bays of navigable waters—outside the path of commercial shipping and closer to rescue services. Therefore, the threat to maritime commerce here is comparable to that in *Tandon*, where the Second Circuit concluded "the risks to maritime commerce posed by a rescue operation at a dock are substantially lower than the risks to maritime commerce posed by a rescue operation at sea." *Tandon*, 752 F.3d at 252. At worst, this type of incident might temporarily inconvenience commercial vessels for a few hours if emergency responders had to use their lanes or channel to get to the shallow recreational bay. This possibility does not present a potentially disruptive impact but only a "fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 539.

Moreover, even if the Court proceeded to the next step of the of the connection test, admiralty jurisdiction would still not lie. This step requires the Court to determine "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 539. "[T]he substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Id*. at 541 (citing *Sisson*, 497 U.S. at 364). In essence, the issue is "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id*. at 539 (citing *Foremost*, 457 U.S. at 675). The Supreme

Court has held that "repair or maintenance work on a navigable waterway performed from a vessel" falls within this substantial relationship, *Grubart*, 513 U.S. at 540, as does "navigation of boats in navigable waters," *Foremost*, 457 U.S. at 675, and "storage and maintenance of a boat at a marina on navigable waters," *Sisson*, 497 U.S. at 365. However, the relationship is too attenuated where the activity giving rise to the incident is merely swimming in navigable waters, or flying an airplane over navigable waters. *Exec. Jet Aviation v. City of Cleveland*, 409 U.S. 249, 255-256, 270-271 (1972).

First, the Court must describe the "general character" of the alleged tortfeasor's activity which gave rise to the incident. *Grubart*, 513 U.S. at 539. Ficarra incorrectly refers to his own conduct and not that of Germain in describing the activity as "recreational swimming and diving." (Ficarra Br., p. 9). Germain describes the activity as "preparing to get a vessel underway from an anchorage area." (Germain Br., p. 11). However, getting the vessel underway is not the activity which gave rise to the incident. As Ficarra points out, there is no allegation or evidence that he was injured while assisting with removing the anchors and getting underway. *See* Reply in Support of Motion to Remand, Ficarra Dkt. No. 12, p. 4. Nor does mere "navigation" or "anchoring" properly capture the nature of Germain's activity which "is claimed to have been a proximate cause of the incident." *Grubart*, 513 U.S. at 541. Germain's alleged activity which gave rise to the incident is more accurately described as anchoring a recreational vessel in a shallow recreational bay without adequately warning a passenger about the risks of diving in. (Ficarra Dkt. No. 1, Exh. A, at ¶ 9).

The question then is whether that activity has a substantial relationship with traditional maritime activity. The substantial relationship test recognizes that "not every accident in navigable waters that might disrupt maritime commerce will support federal admiralty

jurisdiction." *Sisson*, 497 U.S. at 362; *Foremost*, 457 U.S. at 675, n.5; *Tandon*, 752 F.3d at 251. Germain correctly points out that there is basic overlap in operations between pleasure boats and commercial vessels which often supports a substantial relationship. *See, e.g., Abadi v. Garvey*, No. 07-cv-575, 2008 U.S. Dist. LEXIS 58451, at *6, 2008 WL 2980030, at *3, (S.D.N.Y. 2008) (docking boat); *Podgurski v. Town of N. Hempstead*, 824 F. Supp. 2d 358, 382 (E.D.N.Y. 2011) (maintaining boat mooring); *Sisson*, 497 U.S. at 367 (storage and maintenance of boat at a marina). However, the alleged tortfeasor's activity which gave rise to the incident in the instant case did not involve traditional maritime activity such as navigating, docking, or storing a vessel.

Germain's alleged negligence was anchoring his vessel in a shallow recreational bay without adequately warning Ficarra about the risks of diving in—an activity which is not "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Grubart*, 513 U.S. at 539. In an almost identical case, the Fourth Circuit concluded that admiralty jurisdiction did not extend to a claim brought by a pleasure boat guest who injured himself when he dove from the boat into navigable waters and struck the bottom. *Foster v. Peddicord*, 826 F.2d 1370, 1376 (4th Cir. 1987). The Circuit's reasoning is equally applicable here:

> Reduced to its essence, this case is about swimming and diving, and an unfortunate accident that resulted in the course of a recreational outing in which a pleasure boat was used as a diving platform. It is not about piloting, shipping, or navigational error, or other aspects of traditional maritime activity. There is simply no predicative relationship upon which an otherwise typical tort claim may properly be described as relating to "matters with which admiralty is basically concerned."

*Id*. (citing *Exec. Jet Aviation*, 409 U.S. at 270). The Ninth Circuit also found a substantial relationship with traditional maritime commerce lacking for a "houseboat guest who sustains personal injuries as a result of diving off the boat." *Delta Country Ventures v. Magana*, 986 F.2d

9

1260, 1263 (9th Cir. 1993). Similarly, other courts have held that injuries from diving off of docks and piers into navigable waters do not give rise to admiralty jurisdiction. *See, e.g., Brock v. Lewis*, No. 95-cv-2302, 1996 U.S. App. LEXIS 11871, at \*\*6-7, 1996 WL 276980, at \*2 (4th Cir. 1996); *Chapman v. Grosse Pointe Farms*, 385 F.2d 962, 966 (6th Cir. 1967).

Indeed, the activity in this case has more in common with a tort at a public pool or beach swimming area than any aspect of commercial shipping. The Court must be mindful of the "primary purpose that supports admiralty jurisdiction—namely, 'the federal interest in the protection of maritime commerce.'" *Tandon*, 752 F.3d at 253 (citing *Sisson*, 497 U.S. at 364, n.2). Historically, the law of admiralty has protected maritime commercial vessels and their cargo by providing rules for navigation as well as "maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage." *Exec. Jet Aviation*, 409 U.S. at 270. The Court finds that "the scope of admiralty law has little or nothing to do with the issues that are likely to appear in cases like this one." *Tandon*, 752 F.3d at 253. As the Second Circuit observed in *Tandon*, state courts have long experience dealing with similar torts under state law. *Id*. The connection between the alleged tort here and maritime activity is too tenuous to support admiralty jurisdiction.

### C. Removal Based On Diversity Jurisdiction

Germain also argues that diversity jurisdiction exists in this action pursuant to 28 U.S.C. § 1332(a)(1) because he was a "resident" of Florida at the time of the accident, Ficarra is a resident of New York, and the amount in controversy exceeds $75,000. (Germain Br., p. 13). However, Germain's Notice of Removal made no mention of diversity as a basis for jurisdiction. The Notice states in relevant part that the "District Court has original jurisdiction over this action pursuant to 28 U.S.C. §1333, because the Complaint alleges that the incident/injury involved a

guest from vessel, while on navigable waters of the United States, more specifically Lake Oneida, and this satisfies the requirements for invoking the Court's Admiralty Jurisdiction." (Ficarra Dkt. No. 1, ¶ 5).

Germain cannot assert a completely new basis for federal jurisdiction at this juncture because a "notice of removal may not be untimely amended to add a new avenue of jurisdiction." *Arancio v. Prudential Ins. Co.*, 247 F. Supp. 2d 333, 337 (S.D.N.Y. 2002) (construing alternative assertion of diversity jurisdiction in brief as amendment to removal notice based on federal question jurisdiction); *see also Bernadin v. Am. Airlines, Inc.*, No. 08-cv-1774, 2009 U.S. Dist. LEXIS 56017, at *8, 2009 WL 1910964, at *3 (E.D.N.Y. July 1, 2009) (denying untimely new assertion of federal question jurisdiction). Under 28 U.S.C. § 1446(b), a notice of removal "may be amended freely within the statutory 30-day period calculated from the date of service of the initial state court pleading." *CBS, Inc. v. Snyder*, 762 F. Supp. 71, 73 (S.D.N.Y. 1991). Thereafter, as per 28 U.S.C. § 1653, defective allegations as to jurisdiction may be amended for clarification, but "a wholly missing allegation…cannot be supplied by amendment after the 30-day period has run." *Id.*; *see also Wyant v. Nat'l R.R. Passenger Corp.*, 881 F. Supp. 919, 924 (S.D.N.Y. 1995) ("A defendant may not amend its notice of removal after this thirty-day period to remedy a substantive defect in the petition."); *Mahoney v. Morton Int'l*, No. 96-cv-1115, 1996 U.S. Dist. LEXIS 13868, at *9-10, 1996 WL 535423, at *3 (N.D.N.Y Sept. 18, 1996) (After thirty days, amendment of removal notice only allowed to remedy "technical defects; i.e., those in which the assertions in the original notice reflect an imperfect attempt to show jurisdiction.").

Accordingly, Germain's effort to substantively add an entirely new basis for removal of Ficarra's state court action to federal court is untimely, since the thirty day statutory period for removal expired before Germain first asserted diversity jurisdiction, and the Notice of Removal

reflects no attempt whatsoever to show diversity jurisdiction. Permitting Germain to untimely amend the jurisdictional basis for removal and proceed in this Court on a new basis over Ficarra's objection would contradict the general rule that "federal courts construe the removal statute narrowly, resolving any doubts against removability." *Somlyo v. J. Lu-Rob Enterprises, Inc.*, 932 F.2d 1043, 1045-1046 (2d Cir. 1991). Thus, in addition to lacking admiralty jurisdiction in this action, the Court also lacks diversity jurisdiction for removal since it was not timely alleged.[4] Therefore, Civil Action No. 5:14-cv-00869 must be remanded to the New York State Supreme Court in Onondaga County under 28 U.S.C. § 1447(c).

### D. Germain's Petition for Exoneration or Limitation of Liability

For the same reasons stated *supra* in Part III(B) and Part III(C), this Court also lacks subject matter jurisdiction to hear Germain's related petition pursuant to 46 U.S.C. §§ 30501-30511 in Civil Action No. 5:14-cv-01013. "Although the Limitation of Liability Act provides a federal cause of action for a vessel owner seeking exoneration or limitation, it 'does not provide an independent foundation for federal admiralty jurisdiction.'" *Tandon*, 752 F.3d at 244 (citing *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 143 (2d Cir. 2011). "Instead, the district court will only have admiralty jurisdiction to hear a petition for limitation if it already has admiralty jurisdiction over the underlying claims that the petition seeks to limit." *Id.* Since this Court does not have admiralty jurisdiction over the underlying claims that Germain's petition seeks to limit, the petition must be dismissed.

---

[4] Even assuming amendment was timely, Germain still failed to allege diversity jurisdiction since he simply states that he was a "resident" of Florida at the time of the incident, whereas diversity is concerned with citizenship and "depends on his domicile." *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998); *see also Connolly v. Spielman*, 999 F. Supp. 270, 272 (N.D.N.Y 1998) ("A party may have multiple residences, but only one domicile.").

## IV. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Ficarra's motion for remand to New York State Supreme Court, Onondaga County in case number 5:14-cv-00869 (Dkt. No. 7) is **GRANTED,** and it is further

**ORDERED** that case number 5:14-cv-00869 is hereby **REMANDED** to the New York Supreme Court in Onondaga County, Index No. 2014EF2268, pursuant to 28 U.S.C. § 1447(c), and it is further

**ORDERED** that the Clerk shall mail a certified copy of this order of remand to the clerk of the New York Supreme Court in Onondaga County, and it is further

**ORDERED** that the petition in case number 5:14-cv-01013 (Dkt. No. 1) is **DISMISSED**, and the Clerk is directed to close that case; and it is further

**ORDERED** that the Clerk docket this Memorandum-Decision and Order in case number 5:14-cv-00869 and also in case number 5:14-cv-01013; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**.

February 9, 2015
Syracuse, New York

Brenda K. Sannes
U.S. District Judge